SHERI A. CARNAGHI,    )
           )
     Plaintiff,  )  Case. No. 11 C 2718
    v.      )
           )  Magistrate Judge
Michael J. Astrue,   )  Arlander Keys
Commissioner of Social  )
Security       )
     Defendant. )

## MEMORANDUM OPINION AND ORDER

On September 13, 2007, plaintiff Sheri A. Carnaghi filed a Title II application for a period of disability and disability insurance benefits ("DIB"), asserting that she had become disabled as of July 19, 2007 because of chronic pulmonary insufficiency and chronic heart failure. Record at 34. Her request was denied on November 30, 2007, and upon reconsideration on March 19, 2008.

On April 4, 2008, she requested a hearing before an administrative law judge. ALJ Patrick Nagle held the requested hearing in Orland Park, Illinois on December 16, 2009. Ms. Carnaghi appeared, represented by counsel, and testified; the ALJ also heard testimony from Ms. Carnaghi's husband and a Vocational Expert. Ms. Carnaghi, who was 46 years of age at the time of the hearing, testified that she was 5'4", weighed about 330 pounds, and had been employed as a school bus driver for the previous

nine years. Record at 35. She testified that she lives with her husband and her 19-year old mentally-challenged daughter in a ranch house. Record at 42. With regard to her daily life, Ms. Carnaghi testified that she typically starts her day by helping her daughter get ready for school and by walking her to the bus stop; she then goes back to sleep for "another hour or so." *Id.* Ms. Carnaghi testified that, after her nap, she cleans the house and then reads and browses the internet. She testified that she does several household chores, including folding and putting away the laundry, making the bed, and doing the dishes. Record at 50, 59. She also testified that she can drive within a certain closed area. Record at 59.

Ms. Carnaghi testified that, because she has a history of agoraphobia, which she received treatment for several years ago, she tries to force herself to leave the house at least once everyday. Record at 44. Previously, Ms. Carnaghi did visit a therapist several times, but did not find the sessions helpful. Record at 57. Currently, Ms. Carnaghi is not receiving treatment from a health professional for any mental health issue. Furthermore, she has never been hospitalized for any mental health impairment.

Ms. Carnaghi testified that she cannot walk long distances because she runs out of breath "pretty quick" and her legs and

feet swell. Record at 46. This swelling, according to Ms. Carnaghi, causes pain. Record at 49. In addition, she testified that if she sits too long, her feet swell and she was advised by her doctor to elevate her legs two or three hours a day. Record at 47.

With regard to her impairments, Ms. Carnaghi testified that she was diagnosed with congestive heart failure, carbon monoxide poisoning, COPD, and sleep apnea during her visit to the emergency room on July 19, 2007. When Ms. Carnaghi was discharged, she was advised to quit smoking, to follow a low-sodium diet, and to control her liquid intake. Record at 36. Furthermore, she was instructed to carry an oxygen tank at all times. Record at 41. To address the sleep apnea, Ms. Carnaghi testified that she wears a BiPAP, which aids in her sleep. Record at 40. However, she testified that she does not wake up refreshed, but instead wakes up with a "hangover feeling." Record at 51. She testified that she has smoked for more than 15 years; she testified that she has been encouraged by her doctors to quit, but her prior attempts have been unsuccessful. However, Ms. Carnaghi testified that she had not smoked in the past two months. Record at 39. She testified that, if she could maintain a cigarette-free life for four additional months, she planned to

undergo a gastric bypass surgery to address her "morbid obesity." Record at 54.

Ms. Carnaghi also testified that her back pain, which is a result of her obesity, is another factor that affects her ability to work. Record at 41. Ms. Carnaghi testified that she cannot lift anything over 20 pounds. Record at 54. She also stated that her weight interferes with her ability to pick things off the ground since her "belly [is] in the way." Record at 55.

Ms. Carnaghi's husband testified next. He testified that his wife does not sleep well at night – that she is "up and down" all night and that, as a result, she is "beat" during the day. Record at 58-59. He testified that he does everything at home and that she pretty much does nothing. Record at 58-60.

Next, the ALJ heard testimony from Richard Fisher, a Vocational Expert who had reviewed Ms. Carnaghi's work record. VE Fisher testified that he had reviewed the exhibits in Ms. Carnaghi's file, that he had familiarized himself with Ms. Carnaghi's vocational background, and that he had listened to the testimony at the hearing. Record at 61. He characterized Ms. Carnaghi's past work as a bus driver, as "semi-skilled, SVP-3, medium work by DOT standards." Record at 61. The ALJ then asked the VE whether there are jobs in the economy that a hypothetical individual with Ms. Carnaghi's age, education, and work history

would be able to perform if she were limited to "sedentary work."
Record at 62.  The ALJ described sedentary work as work limited
to lifting up to 10 pounds at a time, standing or walking up to
two hours during the course of an eight hour workday, and sitting
for six hours during the course of the same day.  In addition,
the hypothetical individual would be limited in that they would
have to avoid concentrated exposure to temperature extremes,
wetness, humidity, environmental irritants, including odors, dust
and some gases.  Record at 63.  Finally, the hypothetical
individual would need to avoid any work around ladders, ropes, or
scaffolds, and could only occasionally climb stairs or ramps,
balance, stop, kneel, crouch, or crawl.  Record at 66.  The ALJ
then asked the VE whether, assuming Ms. Carnaghi's vocational
profile relative to age, education, and work history, there would
be other jobs that such hypothetical person could do, and Mr.
Fisher testified that there were, although he did concede that
she could not perform her past work.  More specifically, Mr.
Fisher testified that, in the state of Illinois she could work as
a para mutual ticket checker (3,057 jobs available), telephone
clerk (3,902 jobs available), general office clerk: document
preparer microfilm cutter, paster, press clippings (4,971 jobs
available), surveillance system monitor (801 jobs available), and
tube operator (581 jobs available).  Record at 62-63.  The VE

confirmed that these jobs would be available to individuals who were limited to no exposure to temperature extremes, wetness, humidity and environmental irritants. He testified, however, that, if Ms. Carnaghi had to keep her legs elevated for one to two hours during the course of the workday or if she needed to take an hour nap during the day, all work would be precluded.

On questioning from Ms. Carnaghi's attorney, the VE testified that the job numbers he provided were "strictly proportionate" to the population. Record at 64. Next, Counsel asked about the tolerance level of these jobs in terms of being "off-task." *Id*. VE Fisher responded that the tolerance level will vary from employer to employer, but that, in general, at the unskilled work level, it is a "relatively structured day and therefore an additional 15-minute break would be unacceptable." Record at 65. Counsel then asked the VE to clarify further the meaning of "off-task." The VE stated that the jobs he cited require an employee to generally remain at a workstation and any walking would be limited, adding that, "off-task" means "when the employee is away from the workstation." *Id*. Next, Counsel asked the VE how he calculated the number of available jobs; he responded that the data estimates are derived from the U.S. Department of Labor, Division of Occupational Employment Statistics, and the local area unemployment statistics during

first quarter 2009. Record at 67. Counsel requested a copy of the documentation the VE used to calculate the figures, and also requested the "local numbers," arguing that the use of proportions was inappropriate. Record at 71. The ALJ noted Counsel's objection but overruled it.

In addition to the testimony of the live witnesses, the ALJ also had before him various medical records and evaluations. Prior to her July 19, 2007 visit to the emergency room, Ms. Carnaghi visited her primary physician, Dr. John Demask, and complained of swelling in her feet. Ms. Carnaghi informed Dr. Demask that the swelling had lasted for three weeks. Record at 223. Dr. Demask diagnosed her with pedal edema and tinea pedis and encouraged Ms. Carnaghi to lose weight. Record at 224. He also prescribed Lasix and Mycostatin to help alleviate the swelling.

The swelling did not improve with the medication and Ms. Carnaghi went to the emergency room on July 19, 2007. The record includes medical documentation from various doctors who treated Ms. Carnaghi when she was admitted to Silver Cross Hospital's emergency room. The record shows that Ms. Carnaghi complained of CHF and COPD exacerbation and spent two days in the intensive care unit. Record at 230. The record also shows that Ms. Carnaghi was diagnosed with several ailments including, chronic

obstructive pulmonary disease (COPD), history of obstructive sleep apnea, morbid obesity, history of hypertension, history of depression, and congestive heart failure. Record at 231. The Discharge Summary noted that Ms. Carnaghi's symptoms "improved remarkably during her hospital stay." Record at 232. With respect to her dyspnea, Dr. Amar Garapati noted that Ms. Carnaghi has "clinically improved since her admission." Record at 237. Dr. Garapati also stated that Ms. Carnaghi "continues to be dyspneic on minimal exertion" and "chest x-ray shows mild congestive changes bilaterally with cardiomegaly." *Id.* Dr. Garapati added steroids with "around the clock bronchodilator nebulizers" to her treatment. *Id.* Dr. Garapati also noted that Ms. Carnaghi showed symptoms "strongly suggestive of sleep apnea" and recommended that she undergo sleep studies. Record at 237- 238.

Dr. Christopher Joyce also completed a Report of Consultation regarding Ms. Carnaghi's "morbid obesity." Record at 239. Dr. Joyce noted that Ms. Carnaghi was an "excellent candidate for gastric bypass surgery" after she completes her weight loss program and stops smoking for at least 6-months. Record at 240.

The record also includes a Report of Consultation by Dr. Parag Jain, who noted many of the issues discussed earlier,

including Ms. Carnaghi's "progressive" edema, dyspnea, sleep apnea, and a "combination of chronic obstructive pulmonary disease." Record at 243. On August 21, 2007, Ms. Carnaghi visited Dr. Jain at his practice for a follow-up to address the hypertension issue. After Ms. Carnaghi's visit, Dr. Jain noted that her condition had improved significantly. Record at 274. Dr. Jain also indicated that he expected additional improvements "once she starts her CPAP for her sleep apnea." *Id.*

On July 31, 2007, Ms. Carnaghi made her first visit to Dr. Philip Leung at the Midwest Sleep Disorders Center for her scheduled polysomnographic study. Record at 307. After the study was performed, Dr. Leung recommended that a CPAP titration sleep study be completed for the treatment of Obstructive Sleep Apnea Syndrome. *Id.* On August 24, 2007 Ms. Carnaghi returned to Dr. Leung's office to complete the CPAP titration study. Record at 301. Her Epworth Sleepiness Score was an 8, which was within normal limits. *Id.* The positive airway pressure study revealed "significant improvement of her sleep architecture and sleep continuity with an overall arousal index of 15.7 per hour of sleep time." *Id.* Dr. Leung recommended that Ms. Carnaghi have regular follow-up appointments to "ensure treatment compliance and complete resolution of symptoms." *Id.* Ms. Carnaghi was also

instructed to lose weight. There is nothing in the record to suggest that she sought any additional care for her sleep issues.

Over the next few years, Ms. Carnaghi made several visits to Dr. Garapati's office at Midwest Respiratory Ltd. On August 3, 2007 Ms. Carnaghi visited Dr. Garapati for a hospital follow-up visit. Record at 296. Dr. Garapati noted that Ms. Carnaghi had remained clinically stable and recommended that she continue using Advair and Spiriva coupled with around the clock oxygen. Record at 297. On October 16, 2007, Ms. Carnaghi returned to Dr. Garapati for a follow-up; at that time, he noted that she had lost 20 pounds and remained "clinically stable since her last visit." Record at 293. Dr. Garapati advised her to remain on around-the-clock oxygen. *Id.* She returned again on April 2, 2008, and Dr. Garapati again noted that she had "remained clinically stable since her last visit." Record at 327.

During a follow-up visit in September 2008, Ms. Carnaghi informed Dr. Garapati that she had recently visited Provena St. Joseph's emergency room because she felt dizzy. Record at 325. Dr. Garapati noted that Ms. Carnaghi had lost 16 pounds since her last visit and "appear[ed] comfortable." *Id.* Ms. Carnaghi next visited Dr. Garapati on October 21, 2009; at that time Dr. Garapati noted that Ms. Carnaghi's "extremities show no cyanosis, clubbing, or edema." Record at 323. He added that her "[m]uscle

power and coordination are normal." *Id.* The most recent visit to Midwest Respiratory Ltd. in the record is dated April 23, 2010. During this visit, Dr. Garapati noted that Ms. Carnaghi "remained clinically stable since her last visit." Record at 355.

The ALJ issued his decision on January 7, 2010, finding that Ms. Carnaghi had "not been under a disability, as defined in the Social Security Act, from July 19, 2007 through the date of this decision." Record at 20. He determined that Ms. Carnaghi met the insured status requirements of the Social Security Act through December 31, 2012 and that she had not engaged in substantial gainful activity since July 19, 2007. Record at 13. The ALJ determined that Ms. Carnaghi suffered from chronic obstructive pulmonary disease, sleep apnea, hypertension, and obesity, but did not have an impairment or combination of impairments that met or equaled a listed impairment; he also determined that she had the residual functional capacity to perform sedentary work involving occasionally climbing ramps or stairs, balancing, stooping, crouching, kneeling, or crawling but could never climb ladders, ropes or scaffolds. Record at 15. Thus, he determined that, while she was unable to perform her past relevant work as a school bus driver, van driver, and waitress, she could perform other jobs that exist in significant numbers in the national economy. Record at 19. Therefore, the ALJ determined, she was not

disabled within the meaning of the Act, and was not entitled to benefits.   Record at 20.

After the Appeals Council denied review on March 15, 2011, Ms. Carnaghi filed a lawsuit in this Court, seeking review of the Social Security Administration's final agency decision.   The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on July 14, 2011.   The case is now before the Court on cross motions for summary judgment: Ms. Carnaghi asks the Court to reverse the Commissioner's decision denying her benefits or to remand the matter for further proceedings; the Commissioner seeks summary judgment affirming the Agency's decision.

## DISCUSSION

*Applicable Law*

An individual claiming a need for DBI must prove that she has a disability under the terms of the SSA.   In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1;

fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not, "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

*Analysis of Ms. Carnaghi's Arguments*

Ms. Carnaghi argues that the ALJ's decision should be reversed or remanded because he: (1) failed to require the Vocational Expert to provide the documents underlying his testimony; (2) failed to give proper weight to the treating physician's opinion; (3) made an erroneous RFC determination; (4) failed to make a proper credibility determination; (5) failed to consider the effects of her obesity; and (6) improperly ignored evidence in making his decision.

1.  The ALJ's Reliance on the VE's Testimony

Ms. Carnaghi raises several issues regarding the VE's testimony and the documents underlying his testimony. First, Ms. Carnaghi argues that, because the VE relied on data from U.S. Publishing, a report that is not "among the reports specifically listed as those that the Commissioner will take notice of for

providing 'reliable job information,'" the ALJ was wrong to rely upon the VE's testimony. Plaintiff's Motion for Summary Judgment, pp. 4-5. The Court disagrees. Title 20 states "we will take administrative notice of reliable job information available from various governmental and *other* publications." 20. C.F.R. §404.1566 (2011) (emphasis added). Although U.S. Publishing's material is not included on the list of examples provided by the regulations, there is no indication that the list is intended to be exhaustive; nor – more importantly – is there any indication that the materials the VE relied upon were in any way unreliable. Certainly, Ms. Carnaghi has not demonstrated that U.S. Publishing is unreliable.

Next, Ms. Carnaghi argues that the ALJ's decision warrants reversal because the VE did not disclose the data used to justify his opinions, despite a request by her attorney. She also takes issue with the fact that the VE advised counsel that the report could be purchased for "60 bucks." Record at 76. Ms. Carnaghi also argues that the failure of the ALJ to "inquire as to the basis of the VE's testimony once it was questioned by Plaintiff" makes the ALJ's decision improper.

While a vocational expert is "free to give a bottom line," the data and reasoning underlying that bottom line must be

"available on demand" if the claimant challenges the foundation

of the VE's opinions. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th

Cir.2002). If the VE's conclusions are questioned at the

hearing "then the ALJ should make an inquiry . . . to find out

whether the purported expert's conclusions are reliable." *Id.* At

the hearing, Ms. Carnaghi's Counsel questioned the reliability of

the VE's figures. The following colloquy ensued between the ALJ

and VE:

> ALJ: Mr. Fisher [VE], when you testified about the jobs
> that you've identified today, the numbers of the jobs,
> you said something about there's a statistician that
> develops those numbers, and that these are accurate as
> of the first quarter of 2009. Is that accurate?
>
> VE: Yes
>
> ALJ: So when you say in terms of who's coming up with
> the numbers, could you explain – you're getting these
> numbers from a statistician, is that right?
>
> VE: Correct, I'm not a statistician.
>
> ALJ: All right, and are you taking numbers from a
> statistician that fit the hypothetical, or are you
> altering those numbers somehow?
>
> VE: In this case I haven't done anything with them [the
> numbers].
>
> ALJ: Okay, so those are the actual numbers that came
> from the statistician.
>
> VE: These are sedentary unskilled, and that
> occupational classification, 43-90-61, office clerk,
> general, there are two sedentary unskilled jobs. In
> the total sedentary unskilled jobs in the state of
> Illinois, there are 4971 unskilled sedentary jobs that
> would represent the two jobs that are sedentary

> unskilled.  That's how I interpret it.
>
> ALJ: All right. I just wanted to clarify.

Record at 71-72.  Based on this dialogue, the Court believes that the ALJ properly inquired into the reliability of his conclusions.  *Id.*  However, once counsel challenged the foundation of the VE's opinions, the data and reasoning underlying the VE's figures should have been "available on demand."  *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004) (quoting *Donahue* at 446).  The "available on demand" requirement is not satisfied if the claimant must pay "60 bucks" for the data.  *See Donahue*, 279 F.3d at 446.  And, although the VE had the report and underlying data on a computer screen, it is not clear that he had the screen in front of him at the hearing; nor is it clear that Ms. Carnaghi's attorney had an opportunity to review that screen.  One thing is clear: counsel had no opportunity to cross-examine the VE on the underlying data.  The VE testified that he simply adopted the data and made no adjustments to the statistician's report; but if he is going to rely upon that data in rendering his opinions – and if the ALJ is going to adopt those opinions – then the VE must be held accountable for that information and data, and counsel should have been given a chance to check that accountability.  Accordingly, remand is appropriate.

2.   The ALJ's Evaluation of Treating Physician's Opinion

Ms. Carnaghi argues that the ALJ discounted the opinion of Dr. Garapati, Ms. Carnaghi's treating pulmonologist.  A treating physician's opinion regarding the nature and severity of a claimant's injuries is entitled to controlling weight if it is sufficiently supported by objective medical evidence and is consistent with other substantial evidence in the record.  20 C.F.R.  § 404.1527(D)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  If the ALJ discusses and rejects the opinion of a treating physician, the ALJ must offer "good reasons" for doing so.  *Id*.  The ALJ then must go on to determine what, if any, weight to give the opinion using the factors listed in 20 C.F.R. §404.1527(d)(2), including the length and frequency of treatment, the physician's specialty, the types of tests performed, and the consistency and support for the physician's opinion.  *Id*. at 308; *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir.2010).  An ALJ must "minimally articulate" his reasons for discounting a treating source's opinion.  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.2008).  This standard is "very deferential"; the Seventh Circuit has even called it "lax."  *Id*.  (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)).

Ms. Carnaghi argues that the ALJ failed to properly weigh

the opinion of her pulmonologist, Dr. Garapati. More specifically, she argues that the ALJ failed to discuss the fact that Dr. Garapati was a pulmonologist. She also challenges the ALJ's decision to discount Dr. Garapati's opinions.

It is true that the ALJ gave Dr. Garapati's opinion little weight; but the ALJ explained his reasons for discounting this opinion. The ALJ noted that Dr. Garapati "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant." Record at 18. And that Dr. Garapati's "own report fails to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled." *Id.* Also significant to the ALJ was the fact that Ms. Carnaghi visited Dr. Garapati "on a six month routine basis," suggesting that the limitations may not have been as severe as she claimed. The ALJ noted that, if Ms. Carnaghi's condition had been as severe as she claimed, "the doctor notes would reflect such a condition and there would be more office visits and treatments." Record at 18. The ALJ determined that the evidence did not support Dr. Garapati's opinion that Ms. Carnaghi "could only return to work on a part time basis for four to five hours per day." *Id.* After reviewing the matter, the Court agrees with the Commissioner that

the ALJ properly considered the appropriate factors, including "whether Dr. Garapati was a treating physician, the area in which he specialized, the nature and frequency of his treatment, the type of treatment itself, and whether the objective clinical and laboratory findings supported his opinions." Defendant's Memorandum in Support of Motion for Summary Judgment, p. 8. The ALJ properly articulated his reasoning for discounting Dr. Garapati's opinion. *See* 20 C.F.R. §404.1527(d)(2); 20 C.F.R. § 404.1527(d)(3). And the Court will not second guess his reasoning.

### 3.   The ALJ's RFC Determination

Ms. Carnaghi next argues that the ALJ's RFC determination was wrong and not supported by the evidence of record.   In particular, Ms. Carnaghi argues that the ALJ's RFC was "legally deficient" because he did not "explain" Ms. Carnaghi's "need to have an oxygen tank with her at all times during the day as a factor in her RFC." Plaintiff's Motion for Summary Judgment, p. 10.

Here, the ALJ noted that Ms. Carnaghi "brings her oxygen tank everywhere which limits her excursions." Record at 16. The ALJ noted that Ms. Carnaghi had "improved considerably since her inpatient care and BiPap/oxygen treatment . . . [and she] has

been compliant with using her oxygen" which improved her sleep quality. Record at 17. In fact, the ALJ acknowledged that Ms. Carnaghi had her oxygen tank with her at the hearing. Record at 36. Yet he did not include the use of an oxygen tank in his hypotheticals to the VE; nor has he included specific reference to the use of oxygen in his RFC determination. On remand, the Commissioner should ensure that the issue is addressed.

### 4. The ALJ's Credibility Determination

Next, Ms. Carnaghi contends that the ALJ's credibility determination was erroneous. The ALJ's credibility determination generally will not be overturned unless it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Here, the ALJ found that Ms. Carnaghi's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but that her complaints regarding her extreme limitations were "not fully credible" and were "undermined by other evidence in the record." Record at 17-18. In reaching this conclusion the ALJ considered various factors, including the objective medical evidence, Ms. Carnaghi's medical treatment, prescribed medications, activities of daily living and work history. *See* Record at 17-18. The ALJ noted that Ms. Carnaghi's impairments "did not arise suddenly and begin the day that she was

hospitalized . . . [the impairments] were present prior to her quitting work." Record at 17. It was significant to the ALJ that Ms. Carnaghi not only could work with her impairments, but *did* work, despite her impairments. The ALJ also noted that Ms. Carnaghi's "medications are working and have improved her condition considerably"; this was supported by the "clinical signs and treatment [which] do not support . . . [her] severe allegations and do substantiate that . . . [she] can work within the confines of the residual functional capacity." Record at 17-18. In short, there was much in the record to support the ALJ's decision to discount some of Ms. Carnaghi's claims.

There are, however, some glaring omissions in the ALJ's analysis. Under Social Security Ruling 96-7p, the ALJ's determination regarding Ms. Carnaghi's credibility "must contain specific reasons for the finding on credibility supported by the evidence in the case record, and must be sufficiently *specific* to make clear to the individual and to any subsequent reviews the *weight* the adjudicator gave to the individual's statements and the reasons for that weight" (emphasis added). As explained above, Ms. Carnaghi testified that she needed to nap during the day and that she also needed to elevate her legs throughout the day – both of which would impact her ability to work. Indeed, on

questioning from the ALJ, the VE testified that, if, as she claimed, Ms. Carnaghi needed to take a one-hour nap or raise her legs for one or two hours while at work, she would be precluded from doing any work; all of the jobs he listed as being available to her would then be eliminated. Record at 63. Ms. Carnaghi's testimony on the issue stands unrebutted in the record, and, therefore, if the ALJ were going to reject the notion that she needed to nap during the day or to elevate her legs as she indicated, then he needed to be "sufficiently specific." Because he was not, the Court has no way of knowing whether the ALJ rejected her testimony, rejected the testimony of the VE on the issue or simply failed to consider the impact of these limitations on her ability to work. The ALJ did not specifically address the issue. Accordingly, remand is appropriate on this issue as well.

5.    The ALJ's Evaluation of Ms. Carnaghi's Obesity

Ms. Carnaghi also argues that the ALJ failed to consider her obesity in combination with her other impairments. An ALJ should consider the effects of obesity together with the underlying impairments. SSR 02-1p. However, a failure to explicitly consider the effects of obesity may be harmless error. See Skarbek. In Skarbek, although the ALJ did not explicitly

consider the claimant's obesity, the Court concluded that it was "harmless error" since the ALJ considered the limitations noted by the reviewing doctors, who were aware of the claimant's obesity. Therefore the claimant's obesity was factored indirectly into the ALJ's decision as part of the doctors' opinions.

Here, unlike the ALJ in *Skarbek*, the ALJ explicitly discussed the effects of Ms. Carnaghi's obesity. The ALJ found that Ms. Carnaghi has "worked with her obesity, which she stated probably causes her back pain, for years." Record at 14. The ALJ also referenced Social Security Ruling 02-1p and how the ruling "clarifies that obesity can cause limitations of functions and can affect a claimant's ability to perform routine movements and necessary physical activity within the work environment." Record at 15. The ALJ also mentioned that Ms. Carnaghi "ambulates effectively and has worked full time with her obesity; therefore, when examining the claimant's obesity in conjunction with the claimant's other severe impairments, I find that none of the above listings have been met or equaled." Record at 15. The Court finds that the ALJ did, in fact, consider Ms. Carnaghi's obesity in conjunction with her other impairments.

6. <u>The ALJ's Evaluation of the Evidence</u>

Ms. Carnaghi's final argument is that the ALJ improperly ignored material evidence when making his determination. Specifically, Ms. Carnaghi argues that the ALJ: (1) failed to discuss whether her hypertension or sleep apnea meet or equal any listed impairment in his Listings analysis, (2) failed to conduct any significant inquiry into congestive heart failure, hypercapnic respiratory failure, and hypoventilation syndrome, and (3) did not properly analyze the complaints and diagnoses in making his determination.

A claimant's impairment meets or equals a listed impairment only if it meets "all of the criteria for a listed impairment" or if the claimant "'present[s] medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002)(quoting in part *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990))(emphasis in original).

Listing 3.10 is titled "sleep-related breathing disorders" and instructs such disorders to be evaluated under Listing 3.09 or 12.02. Listing 3.09 regards "cor pulmonale secondary to chronic pulmonary vascular hypertension" and may be met with "[c]linical evidence of cor pulmonale (documented according to

3.00G)" and with either "mean pulmonary artery pressure greater than 40 mm Hg or [a]rterial hypoxemia (which is evaluated under the criteria in 3.02C2)." Listing 12.02 regards "Organic Mental Disorders. Listing 3.10 also instructs that it be evaluated "under the applicable criteria in 4.02," which regards impairments of the cardiovascular system. Ms. Carnaghi's records do not include the type of clinical evidence necessary to demonstrate cor pulmonale; nor has she submitted any records suggesting that her cognitive functioning has been affected by her inability to sleep well.

Ms. Carnaghi also argues that the ALJ ignored hypertension in evaluating her impairments under the Listings. However, as the Commissioner noted, the ALJ evaluated Ms. Carnaghi's impairments under § 4.02 of the Listings, and concluded that the "medical records do not reveal the necessary symptoms, signs, laboratory findings, response to prescribed treatment and functional limitations necessary to meet or equal this listing." Record at 15. Furthermore, the ALJ stated that Ms. Carnaghi's "blood pressure is controlled . . . [and it] appears that her medications are working and have improved her condition considerably." Record at 17. This conclusion is supported by Ms. Carnaghi's medical reports. *See e.g.* Record at 235.

CONCLUSION

For the reasons set forth above, the Court finds that the ALJ erred in failing to adequately address certain issues relating to the VE's testimony – including his failure to provide Ms. Carnaghi's counsel with an opportunity to review and question the data underlying his statistics concerning the availability of jobs Ms. Carnaghi could perform, and his testimony that, if she needed to nap and elevate her legs, she would be precluded from working any of the jobs he identified. The ALJ also failed to include in his hypotheticals to the VE – and failed to consider in making his RFC determination – the effects, if any, of Ms. Carnaghi's reliance on an oxygen tank. Remand is, therefore, appropriate. Accordingly, the Court grants Ms. Carnaghi's Motion for Summary Judgment [#25] and denies the Commissioner's Motion for Summary Judgment [#30]. The case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

Dated: August 6, 2012

ENTER:

Arlander Keys

United States Magistrate Judge